IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



06/04/2026

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MICHAEL D. LONG | § | Case No. 23-41586 |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| CENTURY RECOVERY LLC, as assignee of PROGRESS SOLAR SOLUTIONS, LLC and DANIEL L. ROBERTSON | § § § § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 23-4090 |
| | § | |
| MICHAEL D. LONG | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court issues these findings of fact and conclusions of law after conducting trial in the above adversary proceeding.  Plaintiff seeks to except from discharge a judgment debt owed by Michael D. Long arising from litigation in North Carolina, pursuant to 11 U.S.C. § 523(a)(6).  All parties appeared through counsel at trial.

These findings dispose of all remaining issues pending before the Court in the above adversary and constitute the Court's findings of fact and conclusions of law and fact pursuant to Fed. R. Civ. P. 52, made applicable to adversary proceedings by Fed. R. Bankr. P. 7052.  Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

## I. Findings of Fact

*Trial Generally*

1.  The Court entered its *Joint Pre-Trial Order*[1] on February 12, 2026.

2.  Trial in this proceeding was held on February 24, 2026.[2]

3.  Plaintiff admitted into evidence Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13.  The Court excluded Plaintiff's Exhibit 14 for the reasons set forth on the record at trial.

4.  Defendant admitted into evidence Exhibit A.

5.  The Court heard testimony from the following witnesses at trial:

    a.  Amber Mark; and
    b.  Michael D. Long.

6.  Daniel L. Robertson did not appear nor testify at trial.

*Stipulated Facts[3]*

7.  On or about March 31, 2017, Progress Solar Solutions LLC ("Progress Solar") filed suit in the United States District Court for the Eastern District of North Carolina, (the "2017 Lawsuit") against Michael Long and other defendants who are not parties in this adversary proceeding.

8.  In the 2017 Lawsuit, Progress Solar asserted various claims, including: breach of contract; trade secret misappropriation under federal, North Carolina, and Texas law; unfair and deceptive trade practices under North Carolina law; unfair competition; tortious interference with business relationships; false advertising; and civil conspiracy.

9.  On or about January 4, 2019, Progress Solar and Daniel L. Robertson ("Robertson") filed a second lawsuit in the Eastern District of North

---

[1] ECF No. 44.

[2] ECF No. 40.

[3] The parties stipulated to various facts as set forth in the *Joint* Pre-Trial Order.

Carolina against Long and two other defendants who are not parties in this adversary proceeding (the "2019 Lawsuit").

10. In the 2019 Lawsuit, Progress Solar and Robertson asserted various claims, including: breach of contract; trade secret misappropriation under federal, North Carolina, and Texas law; and civil conspiracy.

11. Thereafter, the two suits were consolidated into a single case under the 2019 Lawsuit.

12. On February 26, 2021, Progress Solar and Robertson moved for partial summary judgment as to liability and filed a Statement of Undisputed Material Facts Supporting Plaintiff's Summary Judgment Motion (the "First Statement of Material Facts" or "First SMF").

13. On August 12, 2021, the North Carolina court entered an order for partial summary judgment as to liability against Long and his co-defendants. The court relied on the First SMF which it deemed admitted, and awarded summary judgment on the following causes of action:

   a. Breach of Nondisclosure agreement (2017 Lawsuit);

   b. Unfair and deceptive trade practices (2017 Lawsuit);

   c. Unfair competition (2017 Lawsuit);

   d. Tortious interference with Progressive Solar's business relationships and prospective economic advantage (2017 Lawsuit);

   e. False association (2017 Lawsuit);

   f. Civil conspiracy (2017 Lawsuit);

   g. Breach of joint confidentiality agreement (2019 Lawsuit); and

   h. Civil conspiracy (2019 Lawsuit).

14. On November 12, 2021, Progress Solar and Robertson filed their Motion in the Cause for Remedies Determinations ("Remedies Motion") and a Statement of Undisputed Material Facts Supporting Plaintiff's

Motion in the Cause for Remedies Determination (the "Second Statement of Material Facts" or "Second SMF").

15. On August 30, 2022, the court entered an order granting the Remedies Motion.

16. On the same day, the court entered judgment awarding damages to Progress Solar and Robertson in the amount of $17,898,408.00 (the "North Carolina Judgment"), and enjoining defendants from competing with Progress Solar.

*The Bankruptcy Case*

17. Mr. Long filed his voluntary petition for Chapter 7 bankruptcy on August 31, 2023.[4]

18. Christopher Moser (the "Trustee") was assigned as the Chapter 7 Trustee.[5]

19. Mr. Long filed his Original Schedules, Chapter 7 Statement of Current Monthly Income Form 122A-1, and Statement of Financial Affairs with his voluntary petition.[6]

20. The only debt listed as owed on Schedule E/F by Mr. Long is the North Carolina Judgment sought to be excepted from discharge by Plaintiff.

21. The original deadline to object to discharge or dischargeability was November 21, 2023.

22. Plaintiff's Complaint was filed on November 20, 2023.[7]

---

[4] Case No. 23-41586, ECF No. 1.

[5] Case No. 23-41586, ECF No. 3.

[6] Case No. 23-41586, ECF No. 1.

[7] ECF No. 1.

23. Plaintiff, Century Recovery LLC filed an unsecured proof of claim on December 5, 2023, in the amount of $18,522,979.08.[8] This proof of claim was signed by Plaintiff's counsel, Stephen W. Davis. The proof of claim asserts the right to collect the North Carolina Judgment. No claim assignment nor sale agreement was included as an exhibit to the proof of claim as filed.

24. No proof of claim was filed by Daniel L. Robertson.

25. No proof of claim was filed by Progress Solar.

26. A summary judgment motion was filed by Plaintiff on November 19, 2024.[9] A response and reply were filed.[10]

27. The Court issued its *Memorandum of Decision* on August 5, 2025 which denied Plaintiff's summary judgment motion and found numerous facts as established for the reasons explained.[11]

### *Previously Established Facts*

28. The previously established facts, as determined by the United States District Court for the Eastern District of North Carolina are attached to the end of these findings as Exhibit D.[12] In reaching its conclusion in this proceeding, the Court carefully reviewed these previously established facts.

### *Facts Established at Trial*

29. Amanda Mark is the operations manager of Plaintiff. Plaintiff is in the business of collecting judgments for creditors who assign those judgments to Plaintiff. As operations manager, Amanda Mark is

---

[8] Case No. 23-41586, Proof of Claim No. 3.

[9] ECF No. 18.

[10] ECF Nos. 22, 26, and 30.

[11] ECF No. 32.

[12] *See* ECF Nos. 32 and 33. The Exhibit D attached to these findings is the same as in this Court's *Order Denying Plaintiff's Motion For Summary Judgment But Establishing Certain Material Facts.* No Exhibit B nor C were admitted into evidence.

responsible for record keeping, supervisory activities, "client" contact, and is familiar with how Plaintiff keeps records. Despite this job description, her testimony at trial was the first time she had testified in court.

30. Amanda Mark stated she testified to validate Plaintiff's alleged ownership of the North Carolina Judgment.  She stated that the "Assignment of Judgments Agreement" gives Plaintiff the right to collect the North Carolina Judgment on behalf of both Progress Solar and Daniel L. Robertson.[13]  The assignment was not provided to Defendant until discovery in this proceeding.

31. The assignment contains a two-year time limit starting March 3rd, 2023, the effective date of the assignment.  Under its own terms the assignment agreement expired on March 3rd, 2025.  No formal written extension of the assignment agreement was admitted into evidence.

32. Amanda Mark stated there have been continuing informal communications about collection since expiration of the assignment agreement. These informal communications have been either by email or text message with Daniel L. Robertson.  Amanda Mark has both a personal and a work cell phone but testified she has communicated some regarding this case using her personal phone.

33. As of the date of trial, the North Carolina Judgment has not been paid.

34. There are no other documents purporting to assign the North Carolina Judgment to Plaintiff.  If there were any other assignment documents, Amanda Mark would know about and be familiar with them.  When asked on cross examination, she agreed that the assignment is the "universe" of documents between Progress Solar and Plaintiff, Century Recovery LLC.

35. The assignment is not signed by Progress Solar, nor is Progress Solar a party to the assignment according to its own terms.

36. The assignment is not signed by Earl Wingo, Jr., though Mr. Wingo is a named party to the assignment.

---

[13] Ex. 13.

37.     The assignment is only signed by "Dan Robertson" as "Judgment
        Holder."  The Court will assume that this signatory to the assignment
        is the same person as Plaintiff, Daniel L. Robertson.

38.     The North Carolina Judgment remains, according to Amanda Mark,
        owned by and property of the "Assignor" in the assignment agreement.
        The "Assignor" in the assignment agreement is "Dan Robertson" and
        "Earl Wingo, Jr."  The North Carolina Judgment is not the property of
        Plaintiff, Century, Recovery, LLC.

39.     Amanda Mark did not know at trial whether Progress Solar is owned or
        controlled by either Earl Wingo, Jr. or Daniel L. Robertson.  Defendant
        testified that Progress Solar is no longer owned by Plaintiff, Daniel L.
        Robertson.

40.     Earl Wingo, Jr. did not testify at trial, and is not a party to this
        proceeding.

41.     Plaintiff is not attempting to collect any obligation other than the
        North Carolina Judgment.

42.     Plaintiff, Century Recovery Group, LLC does not claim that any
        injunction has been violated by Defendant.

43.     Michael D. Long resides in Plano, Texas. He originally worked as a
        general contractor in construction but has spent a significant part of
        his working career in military procurement.  During much of his time
        in military procurement, he also worked with Steven Van Valkenburgh
        and Fire Protection, Inc. d/b/a FPI Environmental.

44.     During the relevant time, Defendant was not an employee of Progress
        Solar, but instead was a contractor.

45.     Defendant began working on, and learning about, Progress Solar's solar
        units and business "as early as 2011 or 2012."[14]  As part of this work,
        he was a technical agent, made repairs, and trained military
        personnel.[15]  He also helped obtain orders from the military, and

---

[14] Ex. D attached hereto, 3, ¶ 8.

[15] Ex. D attached hereto, 4, ¶ 10.

7

worked on shipment and delivery of Progress Solar's products to the military.[16]

46. Defendant therefore had knowledge of Progress Solar's solar towers before his execution of the nondisclosure agreement. It is unclear specifically what technical information Defendant knew, when he knew it, and whether the information he used was known by him *before* or *after* signing the nondisclosure agreement. There was some information he did not know beforehand.[17] There was some he did, and he already possessed prior industry and military procurement contacts and experience.

47. On November 9, 2015, Defendant signed the nondisclosure agreement at issue in the 2017 Lawsuit and 2019 Lawsuit.[18] On cross examination, Defendant stated that he signed the nondisclosure agreement while working in the Middle East for Steve Van Valkenburgh and/or FPI at Progress Solar's facility. He recalled being at Progress' facility for three or four months beforehand and stated that absent signing the agreement he would have been required to leave immediately without completing the job for which he had been sent to the Middle East.

48. The nondisclosure agreement excludes from the definition of "Confidential Information" subject to its provisions "any information that:

(a) is now or thereafter becomes generally known or available to the public, through no act or omission on the part of the Receiver;

(b) was known by the Receiver prior to receiving such information from the Discloser and without restriction as to use our disclosure;

---

[16] *Id.*

[17] Ex. D attached hereto, 5, ¶ 13.

[18] Ex. A.

(c) is rightfully acquired by the Receiver from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure;

(d) is independently developed by the Receiver without access to any Confidential Information."[19]

49. There is no evidence of any restriction on Defendant prior to execution of the nondisclosure agreement.

50. Daniel L. Robertson is not a party to the nondisclosure agreement, but signed it on behalf of Progress, Solar Solutions, LLC.

51. Defendant later had the nondisclosure agreement reviewed by an attorney on his behalf.  A meeting took place in Atlanta, Georgia for Defendant to obtain legal advice from this attorney regarding whether he could form a new company for doing business with the military procurement considering the nondisclosure agreement.

52. Defendant testified he understood the advice he was given to mean that under the nondisclosure agreement there were differences between the solar units he intended to design and the solar units sold by Progress Solar sufficient to avoid violating the nondisclosure agreement.

53. Defendant testified he did not intend to breach his contractual obligations in the nondisclosure agreement, which is why he sought legal advice.

54. Defendant had no contractual obligation to Daniel L. Robertson under the nondisclosure agreement.

55. Defendant described the 2017 Lawsuit and 2019 Lawsuit as patent infringement disputes about solar light stands and breach of a nondisclosure agreement.  The various causes of action asserted therein speak for themselves.

---

[19] *Id.*

56. Defendant stated emphatically at trial that the solar tower he designed did not compete with and was not comparable to the solar tower design sold by Progress Solar. Defendant gave various technical reasons in support of this assertion.

57. For example, according to Defendant the solar towers of Progress Solar operated on direct current only, while Defendant's design used alternating current as well. Defendant testified his design was less mobile, larger, and more costly than the design of Progress Solar. Summarized, his testimony on this point is that the solar towers he designed were not used in the same places nor for the same purposes as those of Progress Solar. According to Defendant, Progress' towers provided light, while Defendant's design provided alternating current power.

58. His testimony at trial regarding design and whether the products competed with one another contradicts some of the findings deemed admitted by the court in North Carolina.[20]

59. Defendant stated he did not testify in the 2017 or 2019 Lawsuit in North Carolina, that he ran out of money to fund his defense, and ended up *pro se*.

60. Defendant testified he did not need Progress Solar's technical information to design a solar tower meeting the military's purchasing specifications.

61. Numerous other individuals were involved in the circumstances resulting in the 2017 and 2019 Lawsuits, including Stephen Van Valkenbergh, Mikel Bills, and Robert Schmidt.

62. Defendant filed bankruptcy because of the North Carolina Judgment.

## II. Conclusions of Law

### Jurisdiction and Standing

1. Before any other matter, this Court must first determine whether it has jurisdiction. "Federal courts are courts of limited jurisdiction, and

---

[20] *See* ¶ 12, *supra*; *see also* Ex. D attached hereto.

bankruptcy courts are no exception.  Their jurisdiction is wholly 'grounded in and limited by statute.'" *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)).  Without the existence of subject matter jurisdiction, the Court cannot properly address the remaining requests of the parties.

2. Original and exclusive jurisdiction over bankruptcy "cases" under Title 11 is vested exclusively in district courts by 28 U.S.C. § 1334(a), while jurisdiction over a debtor's property and property of the estate is vested exclusively in the district court where a "case under title 11 is commenced" by 28 U.S.C. § 1334(e).  28 U.S.C. § 1334(b) provides that "district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11" (emphasis added).[21]  It is usually unnecessary for a court to decide which precise category applies to a particular matter, so long as it determines that it has, at the least, "related to" jurisdiction under § 1334.  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir. 1995) ("For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under,' or 'related to a case under,' title 11.  Instead, to ascertain whether jurisdiction exists, it is necessary only to determine whether a matter is at least 'related to' the bankruptcy." (quoting *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 568-69 (5th Cir. 1995)) (citation modified).

---

[21]  "Title 11" refers to Title 11 of the United States Code, which is also known as the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.  A proceeding "arises under" Title 11 if the proceeding is created or determined by a statutory provision of Title 11.  A proceeding "arises in" a case under Title 11 if, by its very nature, it could arise only in the context of a bankruptcy case or, in other words, it is a proceeding which would have no practical existence outside of the bankruptcy context, such as a bankruptcy administrative matter.  Finally, a proceeding is "related to" a case under Title 11 if its outcome could conceivably effect the bankruptcy estate.  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir. 1995).  These provisions work in conjunction with each other–moving from those matters with the strongest bankruptcy connection [those "arising under"]–to those matters which are only "related to" the bankruptcy proceeding.

3.      If a proceeding falls within one of these three categories, thereby giving the district court subject matter jurisdiction, then the district court may refer the matter to the bankruptcy court for that district under 28 U.S.C. § 157(a).[22]  *See generally Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995).  Bankruptcy cases and proceedings in this district are routinely referred to the bankruptcy judges for the Eastern District of Texas as contemplated by 28 U.S.C. § 157(a).  *See General Order 84-14, Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*, U.S. District Court, Eastern District of Texas, August 6, 1984.

4.      The parameters of subject matter jurisdiction possessed by a bankruptcy court, as a unit of the district court, under the "related to" jurisdiction of § 1334(b) have been frequently addressed.  A matter is "related to" a bankruptcy case if "the outcome could conceivably have any effect on the estate being administered in bankruptcy."  *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).[23]  In later affirming and clarifying that standard in *In re Walker*, 51 F.3d 562 (5th Cir. 1995), the Fifth Circuit stated that an action is "related to" a bankruptcy case if  "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankrupt estate." *FDIC v. Majestic Energy Corp. (In re Majestic Energy Corp.)*, 835 F.2d 87, 90 (5th Cir.1988)).

5.      Although it is not limitless, "related-to" jurisdiction is broadly conferred to "avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate."  *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 787 (11th Cir. 1990).  This analysis was expressly endorsed by the United States Supreme Court in *Celotex*, in which the Supreme Court noted that "the 'related to'

---

[22] 28 U.S.C. § 157(a) provides that "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."

[23] *See also Celotex*, 514 U.S. at 308 n. 6, 115 S.Ct. 1493 (noting that the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted this test, which originated in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984)).  "The key word in the ... *Pacor* test is 'conceivable,' which makes the jurisdictional grant extremely broad." *In re Toledo*, 170 F.3d 1340, 1345 (11th Cir. 1999).

language of § 1334(b) must be read to give district courts [and thus bankruptcy courts under §157(a)] jurisdiction over more than simple proceedings involving the property of the debtor or the estate." *Celotex*, 514 U.S. at 308.

6. Even if jurisdiction exists, a bankruptcy court is permitted to "enter final judgment only if the court has both statutory and constitutional authority to do so." *Galaz v. Galaz (In re Galaz)*, 765 F.3d 426, 431 (5th Cir. 2014) (citing *Stern v. Marshall*, 564 U.S. 462, 481 (2011)). A bankruptcy court may enter final judgments in cases arising under Title 11, or in core proceedings arising under Title 11 or arising in a case under Title 11. 28 U.S.C. § 157(b)(1). Core proceedings include "matters concerning the administration of the estate," and the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(A), & (B); *see In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 572 (5th Cir. 2025); *see also* 1 Norton Bankr. L. & Prac. 3d § 4:31. Non-core proceedings are those only related to a bankruptcy case, and which do not arise under Title 11 nor arise in a case under Title 11. *WRT Creditors Liquidation Tr. v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 606 (S.D. Tex. 1999). A bankruptcy court may not enter final judgments in non-core related-to proceedings absent consent of the parties, but may hear such proceedings, subject to de novo review by the district court. 28 U.S.C. § 157(c)(1); *Exec. Bens. Ins. Agency v. Arkison*, 573 U.S. 25, 34 (2014).

7. An important limit on a bankruptcy court's exercise of jurisdiction is the doctrine of standing. Standing is a jurisdictional issue, and so must be addressed at the outset of a case. *United States v. Hays*, 515 U.S. 737, 742 (1995); *see also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-31 (1990) ("standing is perhaps the most important of the jurisdictional doctrines").

8. "Standing to sue is part of the common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "Standing is a species of subject matter jurisdiction, in that, if a party lacks standing, the court lacks subject matter jurisdiction to

13

hear the matter, and it must be dismissed." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011).

9. Plaintiff has the burden to establish standing, because it is seeking to invoke this Court's jurisdiction. *Alvarado Land Dev., Inc. v. Sewell (In re Sewell)*, 413 B.R. 562, 568 (Bankr. E.D. Tex. 2009). The proof required "depends on the stage of the proceedings at which standing is challenged or otherwise reviewed." *Id.* During the final stage of a case, disputed facts "must be 'supported adequately by the evidence adduced at trial.'" *Id.*, citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

10. In *Sewell*, this Court explained standing to assert nondischargeability as follows:

> The only requirement for standing to bring a nondischargeability action based on § 523(a) of the Bankruptcy Code is that the action must be brought by a creditor. *See* 11 U.S.C. § 523(c). The Bankruptcy Code defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment...." 11 U.S.C. § 101(5)(A).

> *Sewell*, 413 B.R. at 568.

11. Based upon the evidence, and with respect to Progress Solar, the Court finds Century Recovery LLC is not a creditor and has not suffered an injury traceable to the actions of Defendant. The North Carolina Judgment was rendered in favor of Progress Solar Solutions, LLC, and Daniel L. Robertson. Century Recovery LLC was not a party to the North Carolina Judgment. Century Recovery LLC lacks authority to seek to recover the North Carolina Judgment and is not an assignee of Progress Solar. Century Recovery LLC further lacks authority and is not clearly an agent of Progress Solar. In an effort to demonstrate such authority, Century Recovery LLC pointed this Court to the "Assignment of Judgments Agreement" dated March 3, 2023.[24]

---

[24] Ex. A.

12. The judgment assignment agreement was not signed by Progress Solar.[25] It does not authorize Century Recovery LLC to act on behalf of Progress Solar. Nor does the assignment agreement support finding that Daniel L. Robertson somehow acted on behalf of Progress Solar when he executed the assignment agreement. At trial, Defendant contested whether Daniel L. Robertson has any authority to act on behalf of Progress Solar. Plaintiffs failed to convince the Court through credible evidence that Daniel L. Robertson has such authority. No corporate resolution or similar document of Progress Solar was produced at trial.

13. A favorable decision by this Court would not provide redress to Century Recovery LLC as to the judgment claim of Progress Solar. Progress Solar is a creditor and would have standing *if it were a party to this adversary,* which it is not. Century Recovery LLC has no claim through Progress Solar's North Carolina Judgment. Century Recovery LLC does not have standing to seek nondischargeability of a debt it does not own or otherwise have authority to control. No party asserted the existence of a direct injury caused by Defendant to Century Recovery LLC.

14. Accordingly, this Court finds it lacks subject matter jurisdiction over the purported nondischargeability claim alleged by Century Recovery LLC against Defendant through Progress Solar's North Carolina Judgment. Plaintiff's alleged cause of action must therefore be dismissed.

15. Does Century Recovery LLC have a nondischargeability claim through Daniel L. Robertson's North Carolina Judgment? Daniel L. Robertson *himself* is not a party to this proceeding.[26] Nor did Daniel L. Robertson appear at trial to testify. Rather, Daniel L. Robertson's rights are asserted *only* through Century Recovery LLC. Daniel L. Robertson *himself* is a creditor and suffered an injury as memorialized in the

---

[25] *Id.*

[26] *See* Pl. Compl., 2, ¶ 6-7, ECF No. 1.

North Carolina Judgment.  That injury is traceable to the actions of Defendant.  A favorable decision by this Court would provide hypothetical redress to Daniel L. Robertson.  Thus, standing exists as to Daniel L. Robertson.

16. But whether *Century Recovery LLC* has a nondischargeability claim through Daniel L. Robertson's North Carolina Judgment is a different question.  The answer is yes only if Century Recovery LLC has valid legal authority to assert a nondischargeability claim through Daniel L. Robertson's North Carolina Judgment.  At trial, Defendant asserted that Century Recovery LLC lacks this authority and lacks standing.  Century Recovery LLC asserts it has standing as Daniel L. Robertson's assignee under the judgment assignment agreement.[27]

17. Both "Century Recovery LLC, a Utah limited liability company dba Judgment Collectors" and "Dan Robertson" are parties to the assignment agreement.  In relevant part, the assignment agreement states:

    i. Mr. Robertson as ". . . Assignor hereby temporarily assigns, transfers and conveys to Assignee [Century Recovery LLC] any and all of Assignors' rights, titles and interests for a two (2) year period in . . ." the North Carolina Judgment.

    ii. "This is a temporary assignment for a two (2) year period starting upon the Effective Date [March 3, 2023].  This temporary assignment can be extended in writing at the sole discretion of the Assignor.  If there is no written extension of this agreement, all assignments, conveyances right, titles and interests, *including collections*, automatically revert back from Assignee to Assignor" [emphasis added].

    iii. "The judgments are not being purchased by the Assignee; no transfer of ownership of the Judgments is part of this agreement and Judgments remain the property of the Assignor [Dan Robertson and Earl Wingo, Jr.] at all times."

---

[27] Ex. A.

iv. "Agreement will terminate automatically after twenty-four (24) months unless both parties agreed to extend the Agreement. If no written extension is granted by Assignor, this Assignment of Judgments and all associated collection rights will automatically revert back from the Assignee to Assignor."

18. Read together, these provisions of the judgment assignment agreement make clear that it was not a sale of Daniel L. Robertson's rights under the North Carolina, that the assignment was temporary, and that the assignment would expire *automatically* by its own terms on March 3, 2025, unless both Daniel L. Robertson and Century Recovery LLC mutually agreed to an extension. There was no evidence at trial that any such mutual extension occurred, either in writing or otherwise, on or before March 3, 2025.

19. That this adversary was filed before expiration of the assignment agreement's extension deadline on March 3, 2025, is inapposite. Under Utah contract law, which governs the judgment assignment agreement by its own terms, the expiration provision is enforceable. "Where a party is contractually bound to follow certain procedures and timelines in order to invoke specified contractual rights, and the party fails to do so, the party waives his or her rights." *Kenny v. Rich*, 2008 UT App 209, ¶ 24, 186 P.3d 989 (concerning an arbitration provision). Further, in Utah the ""modification of a contract ... requires a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness."" *Mardesich v. Sun Hill Homes LC*, 392 P.3d 950, 954 (Utah Ct. App. 2017), quoting *Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 15, 340 P.3d 183 (omission in original) (citation and internal quotation marks omitted)). This is because "'[t]he party claiming that there has been a modification to a contract ... carries the burden of proof for showing the parties' mutual assent to the modification.'" *Id*. (quotation and footnote omitted).

20. Amanda Mark's testimony did not convince this Court of the existence of a written extension as contemplated by the assignment agreement. Plaintiff attempted at trial to introduce into evidence a text message which purportedly satisfies this written extension requirement. The

17

Court, for the reasons stated on the record, found this evidence inadmissible, and not credible.

21.    Authenticity is not a particularly high bar under current precedent, and "conclusive proof of authenticity" is not required before admission. *McLain v. Newhouse (In re McLain)*, 516 F.3d 301, 308 (5th Cir. 2008), quoting *United States v. Jiminez-Lopez*, 873 F. 2d 769, 772 (5th. Cir. 1989); *see also* Fed. R. Evid. 901. This means evidence of dubious authenticity could in appropriate circumstances be admitted but given little if any weight, as opposed to ruled inadmissible and excluded. Counsel for Defendant took Amanda Mark on voir dire and examined her concerning the possible authenticity of the text message sought to be admitted by Plaintiff.  Hearing her testimony, the Court found its authenticity sufficiently questionable to exclude it from evidence.[28]

22.    Under the evidence, Plaintiff has failed to carry the burden of showing mutual assent to extension of the assignment agreement's term.  For this reason, it has no authority to assert the rights of Daniel L. Robertson under the North Carolina Judgment, and so its claims in this adversary must be dismissed for lack of standing.

23.    This outcome makes sense because Defendant was not a party to the assignment agreement, and so the contractual provisions as between the parties to the assignment agreement are not affected nor tolled by the protections afforded to Defendant under the automatic stay upon his bankruptcy filing.

---

[28] In a new and burgeoning world of generative artificial intelligence, this Court will not be surprised if in future precedents guiding the consideration of authenticity are reexamined, or perhaps even the text of Fed. R. Evid. 901 itself.  Already, generative artificial intelligence is creating new challenges for courts and attorneys concerning legal analysis. *See Pauliah v. Univ. of Miss. Med. Ctr.*, No. 3:23-CV-3113-CWR-ASH, 2025 U.S. Dist. LEXIS 267306, at *8 (S.D. Miss. 2025) ("That said, lawyers are obligated to maintain the standards imposed on them as officers of the court, including forthrightness and candor. Those obligations predate artificial intelligence by centuries."); *see also In re Wise*, No. 25-51132, 2026 LX 185410 (Bankr. W.D. La. 2026); *Kheir v. Titan Team LLC (In re Kheir)*, 674 B.R. 631 (Bankr. S.D. Tex. 2025); *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-CV-281, 2024 U.S. Dist. LEXIS 214029 (E.D. Tex. 2024).  Why should evidence sought to be admitted in cases be immune from such problems?

24. From an abundance of caution, however, the Court will consider the merits of Plaintiff's non-dischargeability cause of action as to the North Carolina Judgment which it purports to assert on behalf of Daniel L. Robertson.  This consideration is not necessary as to Progress Solar.

## Exceptions to Discharge Generally

25. All exceptions to discharge under 11 U.S.C. § 523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997).  The Fifth Circuit, however, has ruled that there are limits to this assumption, particularly in reference to the exceptions under 11 U.S.C. § 523 in which the debtor has allegedly committed fraud.  *Tummel v. Quinlivan* (*In re Quinlivan*), 434 F.3d 314, 318-319 (5th Cir. 2005).  Consequently, courts must balance a debtor's "fresh start" against protecting the victims of fraud.  *Id.* at 319.

26. A preponderance of the evidence standard applies to the determination of the dischargeability of a particular debt under § 523.  *See Grogan v. Garner*, 498 U.S. 279, 287-88 (1991) (holding that a creditor bears the burden of proving nondischargeability by a preponderance of the evidence), and *In re McClendon*, 765 F.3d 501, 504 (5th Cir. 2014) ("Springfield as the creditor was required to bear the burden of proof to establish by a preponderance of the evidence that his claim is nondischargeable.").

27. To fulfill the statutory policy of providing a debtor with a "fresh start," the provisions of § 523(a) are construed liberally in favor of a debtor. *See FNFS, Ltd. v. Harwood* (*In re Harwood*), 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc.* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997)); *Lawrence v. Frost Bank* (*In re Lawrence*), No. 21-10103, 2022 U.S. App. LEXIS 886, 2022 WL 118966, at *1 (5th Cir. Jan. 12, 2022).

28. However, "a debtor has no constitutional or fundamental right to a discharge," because the "Code limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

19

29. Prior to considering dischargeability, the Court must first consider whether a debt is owed by Mr. Long to Plaintiff. *Simmons v. Simmons (In re Simmons)*, Nos. 23-10130, 24-1006, 2025 Bankr. LEXIS 1382, at *21 (Bankr. E.D. Tex. 2025).

30. "A bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt." *In re Avery*, 594 B.R. 655, 661 (Bankr. S.D. Miss. 2018); *see also In re Burg*, 641 B.R. 120, 131 (Bankr. S.D. Tex. 2022). As the Court in *Burg* explained, "debt" is a defined term meaning "liability on a claim" and "claim" is a defined term meaning a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . ." *In re Burg*, 641 B.R. at 131; 11 U.S.C. §§ 101(12) and 101(5).

31. The Court finds that Century Recovery LLC has failed to establish that it is owed a debt by Defendant. The Court finds that Century Recovery LLC has established that Defendant owes Progress Solar Solutions, LLC, and Daniel L. Robertson, a debt which may possibly be nondischargeable.

### 11 U.S.C. § 523(a)(6)

32. 11 U.S.C. § 523(a)(6) of the Bankruptcy Code provides that:

> i. a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity. 11 U.S.C. § 523 (2020).

33. The United States Supreme Court has offered its opinion as to what types of debts Congress intended to except from discharge pursuant to § 523(a)(6). In *Kawaauhau v. Geiger*, the Supreme Court stated that:

> The word "willful" in (a)(6) modifies the word "injury,"

20

indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."  Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury."  Moreover . . . , the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."  523 U.S. 57, 118 (1998); citing RESTATEMENT (SECOND) OF TORTS § 8A, comment *a*, p. 15 (1964).

34.   The Supreme Court concluded that negligent or reckless acts are not sufficient to establish that a resulting injury is "willful and malicious" and that, therefore, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."  *Geiger*, 523 U.S. at 58.

35.   The *Geiger* decision clearly requires that an actor inflict a deliberate or intentional injury, not merely that an actor take a deliberate or intentional act that leads to injury.  *Id.*

36.   In *Miller v. J. D. Abrams, Inc.* (*In re Miller*), the Fifth Circuit analyzed the *Geiger* ruling to articulate a methodology by which to distinguish between acts intended to cause injury as opposed to those merely leading to injury.  156 F.3d 598 (5th Cir. 1998).   The *Miller* court determined that a "willful . . . injury" is established under § 523(a)(6) when there exists either: (1) an objective substantial certainty of harm arising from a deliberate action or (2) there is a subjective motive to cause harm by the party taking a deliberate or intentional action.   *Id.* at 604-06.  It further determined that the standard for determining the existence of a "willful" injury under *Geiger* had subsumed the Circuit's former standard for determining "malicious" conduct under § 523(a)(6) [i.e. "without just cause or excuse"] and had eliminated any need to conduct a separate analysis on that malice element.   *Id.*  The "objective substantial certainty" prong is a recognition of the evidentiary reality that a defendant in a bankruptcy context rarely admits any prior action

21

was taken with the intent to cause harm to anyone.   *Id.*

37.   Plaintiff did not argue the existence of subjective intent.

38.   The objective standard is met when a court finds that a debtor intentionally took action(s) that necessarily caused or were substantially certain to cause the injury. *See  Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 202 (Bankr. S.D. Tex. 2006). Under the subjective test, a court must find that the debtor intended the actual injury that resulted.   *Id.*   The objective standard recognizes "the evidentiary reality that defendants rarely admit malicious intent." *Yu v. Lau (In re Lau)*, No. 11-40284, 2013 WL 2476359, at *7 (Bankr. E.D. Tex. May 28, 2013).

39.   "A court is thus expected to analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff."  *Mann Bracken, LLP v. Powers* (*In re Powers*), 421 B.R. 326, 334-35 (Bankr. W.D. Tex. 2009), citing *Berry v. Vollbracht* (*In re Vollbracht*), 276 F. App'x. 360, 362 (5th Cir. 2007).

40.   "Substantial certainty does not mean absolute certainty, but it must be something more than a high probability." *In re Jones*, 655 B.R. 884, 894 (Bankr. S.D. Tex. 2023).

41.   Determining the existence of objective intent is necessarily a fact intensive exercise.  *In re Smith*, 659 B.R. 500, 508 (Bankr. E.D. Tex. 2024).

42.   Under § 523(a)(6), "a contractual debt may be excepted from discharge if the requisite knowledge and intent is proven." *Kampfhenkel v. Sereboff (In re Sereboff)*, Nos. 21-41671, 22-04016, 2024 Bankr. LEXIS 961, at *9 (Bankr. E.D. Tex. 2024).   Put differently, "a breach of contract may involve an intentional or substantially certain injury."  *Moraine v. Nazarko (In re Nazarko)*, Nos. 05-40372, 05-4270, 2008 Bankr. LEXIS 262, at *18 (Bankr. E.D. Tex. 2008), citing *Williams v. Int'l Brotherhood of Elec. Workers Local*

22

*520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003).

43.   Fifth Circuit precedent requires a "knowing breach of a clear contractual obligation that is certain to cause injury" for a contractual breach to be sufficient as the basis of a cause of action under 11 U.S.C. 523(a)(6). *Williams v. Electrical Workers IBEW Local 520*, 337 F.3d 504, 511 (5th Cir. 2003). "In order to determine whether this has occurred, a court must look at the knowledge and intent of the debtor at the time of the breach." *Moraine*, 2008 Bankr. LEXIS 262 at *19.

44.   The evidence of Defendant's knowledge and intent does not support a find that Defendant committed a *knowing* breach of a *clear* contractual obligation that was *certain* to cause injury.

45.   "Injuries covered by § 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by § 523(a)(6)." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 698-99 (Bankr. E.D. Tex. 2009). This means that § 523(a)(6) "applies to 'acts done with the actual intent to cause injury,' *but excludes intentional acts that cause injury*." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 508 (5th Cir. 2003) (emphasis added) (quoting *Kawaauhau*, 523 U.S. at 61).

46.   It is legally insufficient for purposes of § 523(a)(6) for Plaintiff to demonstrate that Defendant took intentional actions which resulted in an injury to Plaintiff. *See In re Smith*, 659 B.R. 500, 510 (Bankr. E.D. Tex. 2024).

47.   In addition to the previously established facts, [29] Plaintiff admitted Exhibit Nos. 8 and 12 to seek to establish the intent required under 11 U.S.C. § 523(a)(6). Those exhibits consist of orders entered by the United States District Court for the Eastern District of North Carolina, granting summary judgment and awarding relief, respectively. Neither Exhibit No. 8 nor Exhibit No. 12 identifies the standard of intent applied by that court to reach its conclusion. This Court does will not guess as to that standard and cannot review nor reconsider as if on

---

[29] *See ¶ 28, supra*

23

appeal that court's decision.

48. The evidence admitted at trial was insufficient to establish the intent required under 11 U.S.C. § 523(a)(6).

49. Plaintiff, Century Recovery LLC, has failed to demonstrate by a preponderance of the evidence the existence of a deliberate or intentional injury inflicted upon it whether directly, or as purported assignee of Daniel L. Robertson, by Defendant, Michael D. Long.

50. Plaintiff, Century Recovery LLC, has failed to demonstrate by a preponderance of the evidence that Defendant, Michael D. Long's actions created an objective substantial certainty of harm to it, whether directly, or as purported assignee of Daniel L. Robertson.

51. Plaintiff, Century Recovery LLC, has failed to demonstrate by a preponderance of the evidence that Defendant, Michael D. Long's actions created a subjective substantial certainty of harm to Plaintiff, whether directly, or as purported assignee of Daniel L. Robertson.

52. Thus, Plaintiff, Century Recovery LLC, has failed to sustain its burden of proof that any portion of the indebtedness allegedly owed to it by Defendant, Michael D. Long, arose from the infliction of a "willful and malicious injury" as contemplated by § 523(a)(6).

## III.   Conclusion

1. Because the Court concludes that Plaintiff, Century Recovery LLC, lacks standing, the Court finds it has no subject matter jurisdiction and that the Plaintiff's claims must be dismissed.

2. Even if standing exists, the Court concludes that Plaintiff, Century Recovery LLC, has failed to prove by a preponderance of the evidence that it, whether directly, or as purported assignee of Daniel L. Robertson, is owed a debt which arose from a willful and malicious injury inflicted by Defendant, Michael D. Long, judgment must be rendered for the Defendant under 11 U.S.C. § 523(a)(6).

3.   To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

4.   An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 6/4/2026

THE HONORABLE JOSHUA P. SEARCY
UNITED STATES BANKRUPTCY JUDGE

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| PROGRESS SOLAR SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 5:17-CV-152-D |
| v. | ) | |
| | ) | |
| FIRE PROTECTION, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| PROGRESS SOLAR SOLUTIONS, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 5:19-CV-5-D |
| | ) | |
| MICHAEL D. LONG, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING PLAINTIFFS'
SUMMARY JUDGMENT MOTION**

Plaintiffs Progress Solar Solutions, LLC ("Progress Solar") and Daniel L. Robertson

("Robertson" and, together with Progress Solar, "Plaintiffs"), pursuant to Local Civil Rule 56.1,

sets forth the following facts about which there is no genuine dispute:

## Background

1.     Progress Solar is a North Carolina limited liability company, formed in 2008.

Declaration of Daniel L. Robertson filed May 25, 2017 ("2017 Robertson Dec."), ¶¶2, 4, 5, D.E.

28 at pp. 1-2.[1] Progress Solar's business is manufacturing portable solar light towers ("SLTs"). *Id.* ¶6, D.E. 28 at p. 2. Progress Solar's light towers are powered by solar, solar/wind, and solar/hybrid (solar panels and at least a back-up generator) means. *Id.*

2.      A material portion of the SLTs—which can also serve as power generators—that Progress Solar manufactures are intended for ultimate use by various departments of the United States Military or Department of Defense ("DOD"). *Id.* ¶10, D.E. 28 at p. 4. The majority of the orders for these solar light towers are placed by the Defense Logistics Agency ("DLA"). *Id.*

3.      The DLA, in turn, submits requests for quotations or "RFQs" to various groups of pre-approved Maintenance, Repair, and Operations (or "MRO") "prime vendors" who have contracted with the DLA to bid for a set period of years on "RFQs" for designated types of equipment the military needs. *See id.* ¶11, D.E. 28 at p. 4.

4.      In May 2010, Norman Stephen Van Valkenburgh ("SVV"), now-deceased, approached Dan Robertson, Progress Solar's corporate manager, about forming a relationship between Progress Solar and one of several companies apparently operated by SVV. SVV proposed that one of SVV's companies would serve as a sales representative or "dealer" for Progress Solar's portable light towers, especially to military users. *Id.* ¶¶2, 13, 18, D.E. 28 at pp. 1, 5–6, and Ex. 1 thereto, D.E. 28-2.

---

[1] This Court has consolidated the above captioned cases, Case No. 5:19-CV-5-D (the "2019 Action") and Case No. 5:17-CV-152-D (the "2017 Case"). *See* D.E. 148 in 2017 Case, at 3–6, 29–30; D.E. 50 in 2019 Action, at 3–6, 29–30. Per the convention the Court first used in its September 24, 2020 Order, references to the docket in the 2017 Case are not underlined. References to the docket in the 2019 Case are underlined. Thus, "D.E. 5" refers to docket entry 5 of the 2017 Case, while "D.E. 10" refers to docket entry 10 of the 2019 Case.

Meanwhile, references to declarations already on file will usually, as here, reference the specific declaration being cited at its relevant paragraph numbers, and then also refer to the docket entry where that declaration was filed and the page number(s) of that declaration where the cited paragraphs appear.

### The Dealer Agreement between Progress Solar and FPI

5.     In April 2012, Progress Solar entered into an International Dealer Agreement (the "Dealer Agreement") with one of the companies SVV controlled, Defendant Fire Protection Inc. dba FPI Environmental ("FPI").  Ex. 5 to 2017 Robertson Dec., D.E. 28-6.

6.     The Dealer Agreement provided, in most pertinent part, that Progress Solar could terminate it "at any time by written notice . . . in the event PSS [Progress Solar] decides to terminate all outstanding dealer agreements for PSS products and offer a new or amended form of dealer agreement."  D.E. 28-6 at §16.A, p. 6 of 9.  The Dealer Agreement also provided that:

> PSS may terminate this agreement upon notice to FPI on any of the following events:  (1) failure of FPI to fulfill or perform any one of the duties, obligations, or responsibilities of FPI in this agreement, which failure has not been cured within 30 Days' notice from PSS.

*Id.* at §16.B.

### Defendant Bills' and Defendant Long's long-standing involvement in the relationship between Progress Solar and FPI.

7.     Defendant Mikel Bills ("Bills") was a long-time sales employee of FPI, holding the title of National Sales Manager and later Vice President of Sales.  Bills was involved in the relationship between Progress Solar and FPI from its outset until its termination in 2016. *See, e.g.,* Declaration of Mikel Bills ("Bills Dec."), ¶¶11, 14, D.E. 8-2 at p. 2; 2017 Robertson Dec, ¶¶38, 42, D.E. 28 at pp. 10-11.

8.     Defendant Michael Long began working on Progress Solar units as early as 2011 or 2012.  Deposition of Michael Long as 30(b)(6) Designee for Solar Mod Systems, Inc. ("Long

Dep.") at 53:11–20, 67:6–25.[2] Long became involved with Progress Solar because he had a long-standing relationship with SVV, and served for decades as a service, training, "direct sales and customer relations liason[] for FPI working directly with U.S. military personnel and civilians responsible for acquisitions in the Middle East." *See* Long Apr. 17, 2017 Dec., ¶¶12, 22, D.E. 10-1 at pp. 2-3.

9.  Bills was a salaried employee of FPI, and Long was a Contractor and/or manufacturing business partner during the time periods relevant to this dispute. Both Bills and Long maintained FPI and later Solar Mod Systems, Inc. (SMS) email addresses. *See* Deposition of Jeffrey Van Valkenburgh ("JVV") as 30(b)(6) Designee of FPI ("JVV/FPI Dep."), at 48:15–49:13, 58, 96:25 to 97:22.

10.  Throughout the relationship between Progress Solar and FPI, Long served as a technical representative and agent, working closely with the parties to the Dealer Agreement to make minor repairs to Progress Solar's units in the field, and to train military personnel on the light towers' operation and maintenance. 2017 Robertson Dec., ¶45, D.E. 28 at pp. 12-13. As the relationship continued, Long also began to assist in obtaining orders for Progress Solar's light towers from military officials, and in inspecting and assisting with the shipment of the light towers after Progress Solar manufactured them. *Id.*

---

[2] Although Long's and SMS' Rule 30(b)(6) deposition took place over two different sessions, the pages of those deposition sessions were numbered sequentially. Therefore, citations are only made to the applicable page number. Plaintiffs will, again, include each specifically cited page from any deposition in a new Appendix to be filed contemporaneously herewith. Plaintiffs also previously tendered the complete deposition transcripts of Michael Long (SMS Rule 30(b)(6) designee), Jeff Van Valkenburgh (FPI Rule 30(b)(6) designee), and Dan Robertson (Progress Solar's Rule 30(b)(6) designee) to the Court in chambers and thus, absent further request from the Court, will not resubmit those complete depositions.

11.     In the summer of 2015, the DLA placed a large order with an MRO by the name of Noble Sales Co., Inc. dba Noble Supply & Logistics ("Noble Supply" or "Noble") for 250 units of Progress Solar's light towers. *Id.* ¶¶56, 60, 66, D.E. 28 at pp. 15-18. The process of manufacturing and then shipping, in various increments, those light towers took until March 29, 2016 to complete. *Id.* ¶58, D.E. 28 at pp. 15-16.

12.     Following receipt of this order, Defendants SVV, Bills, and Long each discussed with Progress Solar's representatives those Defendants' desire for Long to spend significant time in Progress Solar's manufacturing facility, observing the quality control process, becoming thoroughly trained on operations, maintenance and troubleshooting of PSS Systems and assisting in the shipping of those 250 Progress Solar light towers. *Id.* ¶61, D.E. 28 at pp. 16; FPI's Answer at ¶26, D.E. 12 at p. 5.

13.     Before giving Long such extensive access to its operations and proprietary information, Progress Solar required that Long—for himself, FPI, and any other affiliates—first enter into an agreement with Progress Solar that contained, *inter alia*, nondisclosure and noncompetition terms (the "NDA"). On November 9, 2015, Long entered into that agreement— not only for himself and FPI but also for all entities he became associated with during the time frame covered by the NDA. *See* Ex. 1 to the 2d Am. Cmplt, D.E. 89-1, at p. 2 or Dep. Ex. 56 at p. 48 of 48; 2017 Robertson Dec., ¶¶61-63, D.E. 28 at pp. 16-17; *see also* Long Dep. at 142:22 to 143:23. Among other things, the NDA required the parties "(a) to maintain all Confidential Information in strict confidence; (b) not to disclose Confidential Information to any third parties; and (c) to use Confidential Information only for the Business Purpose" (which the NDA defined as being a "business opportunity of mutual interest"). D.E. 89-1 at 1. The NDA further bound Long, FPI and, upon its formation, SMS to "not . . . directly or indirectly, manufacture, distribute,

invest in, sell or rent a competitive solar, solar/wind or solar/hybrid light tower within the United States for two years from the date of this agreement." *Id.* at §8, p. 3 or Ex. 56 at same, p. 48.

14. In conjunction with the manufacture and shipment of the order for 250 light tower units placed in 2015 and completed in 2016, Long spent time in Progress Solar's facility on at least nine different occasions, and enjoyed substantial access to Progress Solar's proprietary information. D.E. 28 at ¶66; *cf.* Long April 17, 2017 Dec., ¶27, D.E. 18-1 at p. 6.

15. In addition to the proprietary information regarding the technical functioning and building of Progress Solar's solar light towers, Long and FPI gained access to Progress Solar's proprietary business information, including Progress Solar's unique system of obtaining advance payment or "deposits" from its military customers through the DLA or DOD. Though FPI had some previous involvement with MROs, FPI had never been able to secure a deposit from either an MRO, or the DOD or DLA, before Progress Solar negotiated the 2015 order for 250 of its portable SLTs. Deposition of Daniel Robertson as Progress Solar's 30(b)(6) Representative and individually ("Robertson Dep."), at 398:2–25.[3]

**Defendant Long's relationship with Progress Solar consultant, Robert Schmidt.**

16. In the Fall of 2015, shortly before Long, FPI and Progress Solar entered into the NDA, Long met Robert (Bob) Schmidt ("Schmidt"), who had been working as a sales consultant for Progress Solar since early 2010. *See* Declaration of Daniel L. Robertson being filed contemporaneously herewith within the Appendix ("2021 Robertson Dec."), ¶4, App. p. 445; Robert F. Schmidt Declaration being filed contemporaneously herewith ("Schmidt Dec."), ¶¶2, 5, App. pp. 462-63; Long Dep. at 123:1–23.

---

[3] Mr. Robertson's Rule 30(b)(6) and individual depositions also took place over two different days but the page numbers were again numbered sequentially throughout. Accordingly, references will just be made to the applicable page number of the deposition transcript.

17.   By the time Long was introduced to Schmidt, Schmidt had formed his own company, Applied Power & Water, LLC ("APW"), and—unbeknownst to Progress Solar—was using his knowledge of Progress Solar's proprietary technology and operations, which Schmidt had gained through his business relationship with Progress Solar, to develop his own solar light towers to compete with those offered by Progress Solar. "2021 Robertson Dec.", ¶¶4–11, App. pp. 445-46; *cf.* Long Dep. at 487:3–7 (in explaining Dep. Ex. 168, which is a November, 2015 email thread between a prior PSS technical service employee, Carter Bosquet, Long and Schmidt, Long concedes that when he discusses how the military will be receiving the "competition[']s" light towers until March, he was referring to Progress Solar's SLTs as the competition); Dep. Ex. 168 at p. 2 of 16 [Nov. 21, 2015 at 6:44 PM Long email], App. p. 258.[4]

18.   On November 5, 2015, Schmidt and APW entered into a Joint Confidentiality Agreement (the "JCA") with Long and an already existing company of Long's, Environmental Rigging Services, Inc. ("ERS"). *See* JCA filed as Ex. 1 to the 2019 Cmplt at D.E. 1-1; *accord* Dep. Ex. 163 (the JCA defines APW as the "disclosing party" and Long and ERS as the "receiving party"); *see also* Long Dep. at 451:1 to 452:2; Schmidt Dec. ¶¶4, 15(b), App. 463, 466. The JCA provided numerous protections for Schmidt's intellectual property and proprietary information, including through Long's promise that he would not "make use of" Schmidt's or APW's confidential information by, inter alia, "copy[ing] or reverse-engineer[ing]" it. D.E. 1-1 or Dep. Ex. 168 at ¶¶ numbered 1 & 2.

---

[4] Given the cumbersome nature of the bate-stamp numbers, this SUF refers instead to the page of the exhibit as it will be filed. Note, however, at least with respect to documents produced by PSS that, generally, the final bates-stamp or document id numbers end in _0001, *et. seq.*, and that ending number correlates to the specific page number of that particular exhibit.

**By the day after Long signed the NDA, in which he promised not to compete with Progress Solar, he was marketing the new Power Cube, that Schmidt was designing, to the U.S. Military**

19.     In reliance on the JCA, Schmidt began sending Long drawings and explanations of a competing solar light tower he was developing, the Solar Power Cube. *E.g.* Dep. Ex. 61 at p. 2 & 6 of 6, App. pp. 50, 54. Schmidt was referring to his competing SLT design as a "Power Cube" by no later than November 3, 2015. *See id.* at p. 3 of 6, App. p. 51 (where Schmidt writes "I think the power cube will be even more marketable to the military than the light cube"); Long Dep. at 463:10–21. Both Long and Schmidt also referred to the Power Cube as a solar light tower. Long Dep. at 489:23 at 490:8, 518:20–24; 553:18–22; *cf.* Dep. Ex. 61 at pp. 3-4 of 6 (discussing the Power Cube's mast; the mast constitutes the "tower" portion of both SLTs and Power Cubes aka SGPCs).

20.     Long took those drawings of, and other information about, the Power Cube and immediately used them to begin marketing the Power Cube design to the United States Military, including through communications with senior military personnel. *See* Dep. Ex. 61 at p. 1 (on November 10, 2015, Long emails about taking "Chief Parsons"—one of the main military officials then looking to order light towers—"out" when Chief Parsons is in Austin, Texas, for a trade show to be held in early December; additionally, two days beforehand, Long also writes Schmidt that "Chief Parsons is ready, and would like to discuss . . . before the next order"); Dep. Ex. 168 at, *e.g.*, p. 9 of 16 (where Long, on November 11, 2015, states "I'm hoping to get orders lined up asap"), p. 8 of 16 (in a November 12 email, Long reports that it: "looks like chief is wanting to order 250-300 [SLTs] each quarter to fill out [an] initial 3000"), App pp. 264-65.

21.     The initial marketing communications between Long and potential military buyers transpired in November and December 2015, during the same period when Long was present in

8

Progress Solar's manufacturing facility on at least a monthly basis,[5] and immediately <u>after</u> Long had signed the NDA with Progress Solar on November 9. Long Dep. at 159:9 to 160:22; D.E. 89-1. The day after signing the NDA, on "November 10th of 2015, [Long was] already talking with Chief Parsons"—a military official with decision-making authority—"and working towards securing orders . . . ." *Id.* at 184:12–16, 196:1–11; *accord* Dep. Ex. 61 at p. 1 of 6, App. pp. 49-50. Long acknowledges that the United States Military was the "primary market" for the Power Cube. Long Dep. at 484:7–13.

22. During this same time frame immediately after entering into the NDA and non-compete with Progress Solar, Defendant FPI—Progress Solar's long time dealer—already was deeply involved in Long's efforts to secure orders from the military for a competing portable light tower. *E.g.*, Dep. Ex. 168 at p. 9 of 16, App. p. 265 (on November 11, 2015, Long emailed that he "just got off the phone w/ Steve [Van Valkenburgh] might be looking at getting visa for Saudi they trying to get trade show set up for products could be very good for us"). On at least one occasion in November, 2015, after he had been with Progress Solar and representatives of the ordering MRO, Noble Supply, to inspect the latest shipment of Progress Solar's SLTs that had been ordered in the Summer of 2015, Long went to dinner with Noble representatives and started marketing to those representatives the competing SLT aka the Power Cube he planned to manufacture. *See* Dep. Ex. 168 at p. 1-2 of 16, App. pp. 257-58 (where Long, replying on November 22, 2015 to Schmidt's inquiry about "how'd the meeting with Noble go," stated: "I had

---

[5] *See, e.g.*, 2017 Robertson Dec. at ¶66, D.E. 28 at p. 18; D.E. 28-19 ("Mike Long will be the POC [point of contact] for FPI in North Carolina this trip."); Dep. Ex. 169 at pp. 4-5 (Long at Progress Solar's N.C. facility from Dec. 9 to 11, 2015, and then again on at least Dec. 28), p. 6 (Long is "with Dan" Robertson on Jan. 25, 2016), App. pp. 276-78.

dinner with Noble before I left, they were in site [Progress Solar's Wake County facility] for the load out again").

23. As part of these design and sales efforts, Long asked Schmidt to generate and provide him with a specification sheet that he could use to conduct further marketing efforts with senior military personnel. *See, e.g.*, Dep. Ex. 166, esp. at p.2 of 4 (where Long answers Schmidt's question about the timing of his need for the spec sheet by saying he "absolutely need[s] it for trip to Kuwait" where he was going the "second week of December"); App. p. 252; *cf.* Dep. Ex. 171, App. p. 280 (Schmidt asks Carter Bosquet about his work on the "spec sheet" and mentions that they can't submit it until "our patent attorney documents it"; Long replies "let me know if you need $$ for pat[ent] attorney"). Long also specifically requested that the specification sheet demonstrate comparisons between Schmidt's Power Cube design and Progress Solar's solar light towers,[6] as well as the SLTs made by another potential competitor, Wanco. Dep. Ex 166[7] at p. 2 of 4, App. p. 252; *accord* Dep. Ex 168 at p.10 of 16, App. p. 266.

24. Long acknowledges that this series of communications in, *e.g.*, Exhibit 168 involving Schmidt and himself were referring to marketing his ideas and Schmidt's ideas (*i.e.*, the Power Cube) **jointly**. *See* Long Dep. at: specifically, 479:17-24 and, for full context, 479:8 to 480:11.

25. During this time frame in the Fall and Winter of 2015-16, Schmidt was also working with a Texas company, which is variously referred to as Sub Assembly Group or

---

[6] Long confirmed in his deposition that his reference to "Progressive" in Exhibit 166 meant Progress Solar. Long Dep. at 479:7 to 480:8; *see also id.* 187:20 to 188:4; 237:7-22 (other examples of Long referring to Progress Solar as "Progressive").

[7] Much, if not all, of Dep. Ex. 166 is repeated in Dep. Ex. 168, because Ex. 168 is a similar email thread continuing for a longer period of time.

Specialized Armor Group, LLC ("SAG"),[8] to enter into a non-disclosure agreement with Long and him, and then to produce the Power Cube design that he and Long were working on. Long Dep. at 374:3–8, 460:1–6, & 523:16–20. *See also* Dep. Ex. 165 (joint confidentiality agreement between APW, SAG, and a SAG principal and friend of Long's, Allen Daragalayi, in which SAG and Daragalayi are the parties receiving APW and Schmidt's confidential information).

26.      Schmidt traveled to see, stay and work with Long in Texas from November 29 to December 1, 2015. *E.g.*, Dep. Ex. 169[9] at pp. 1-2 of 7, App. pp. 273-74. On that trip, Schmidt brought with him various Progress Solar light tower parts, as well as drawings and design information, that he shared with Long and SAG to help in the fabrication of a prototype Power Cube. Long Dep. at 456:6–13; 471:10–13; Schmidt Dec., ¶9, App. p. 464. The Progress Solar parts that Schmidt brought with him on this visit to Long in Texas included "Progress Solar batteries, . . . Progress Solar inverters, . . . Progress Solar lights, . . . Progress Solar pieces." Long Dep. at 125:16–22. Schmidt brought these parts, as well as his design information for the Power

---

[8] At least two lawsuits were filed in Dallas County, Texas arising out of interactions between Long and various SAG employees or would-be buyers. In the first, Randall T. Wilson sued, *inter alia*, SAG, several SAG principals, Long, SMS, FPI, Bills and SVV, alleging Wilson purchased SAG based on an agreement providing that SAG would get all Long's and SMS manufacturing work for the SGPCs the U.S. military was buying from SMS, but that SAG and Long deceived him and, instead, had that fabrication work done by a Robert Horton and company called Commercial Body & Rigging ("CB&R"). *See Wilson v. SAG, et al.*, Dallas County, Tex., Cause DC-17-02857. In the second lawsuit, Long and SMS sued Mr. Wilson, as well as a SAG/Wilson employee named James "Jim" D. Vincent, Jr., alleging Vincent and Wilson had defamed them, and tortiously interfered with Long's contractual relations. *See Long, et al. v Vincent, et al.*, Dallas County, Tex., Cause DC-17-04262; *see also* Dep. Ex 158. In his deposition in the Progress Solar cases, Long conceded that Jim Vincent was involved in fabricating the prototype of SMS' SGPC-2400—Long Dep. at 497:1-13—and had access to the design drawings that Schmidt had SAG prepare. *Id.* at 408:12-14; *see also* Schmidt Dec., ¶10, App. p. 464.

[9] Schmidt provided Plaintiffs with the texts between himself and Long that were marked as Dep. Ex. 169; those texts came from Schmidt's phone. Schmidt Dec., ¶¶15.a, 15.d, App. pp. 465-66. Thus, in that document, incoming texts are from Long to Schmidt, while outgoing texts are from Schmidt to Long. *Id.*; *accord* Long Dep. at 493:21 to 494:9; 502:23 to 503:2.

Cube, because Long and he planned to have SAG develop 3-D drawings of the competing light tower or cube, and to start ordering steel and other materials needed to manufacture a prototype unit. Schmidt Dec., ¶10, App. p. 464; Dep. Ex. 169 at pp. 1-2 (texts from "Incoming, 12/2/15 8:22:33 AM" to "Incoming, 12/2/15 8:25:12 AM" with Long stating "I'm ordering steel today," Schmidt stating "I'll send a parts list for the balance of the components," and Long stating "Great . . . I don't want to wait I'm hoping to have order schedule timeline after breakfast or worse case after dinner.").

27.     During Schmidt's trip to Texas, Long took him to have a female employee at SAG take Schmidt's Power Cube design drawings and, through the use of a program called AutoCAD, turn them into 3-D design drawings and blue prints. *See* Long Dep. at 126:6-11, 169:17-25, 555:25 to 556:13. Long also confirmed that the Progress Solar parts and pieces that Schmidt brought to Texas were left with SAG. *Id.* at 471:10-13. SAG subsequently fabricated the first prototype of SMS' Power Cube aka the SGPC-2400. Long Dep. 373:8-25, 376:21 to 377:24; *cf.* Dep. Ex 166 at p. 1, App. p. 251 (top email from Long on November 12, 2015 stating "SAG has agreed to build two units not batteries just steel portion for me"). Notwithstanding Long and SAG's making use of these design drawings—which were clearly trade secrets and part of Schmidt's confidential information under the JCA—as well as the fact that SAG was paid $30,000 for its work building the prototype, Long had SAG invoice Schmidt for the almost $1,000 cost of preparing those AutoCAD drawings of the Power Cube. *E.g.*, Long Dep. at 126:6-11 (addressing Schmidt's payment obligation), 383:12-20 (addressing payment to SAG); *see also* Dep. Ex. 172, App. p. 281.

28.     During the first day of Long's deposition, he testified that, at the conclusion of Schmidt's November 2015 visit to Texas, he explicitly refused Schmidt's offer to be "business partners," claimed he told Schmidt they were "not doing anything" together, and that he took

Schmidt to the airport and sent him home. Long Dep. at 126:5-11; *see gen'ly id.* at 124:17 to 127:15. Long also testified, during his first deposition session, that he was quite troubled by Schmidt's bringing all those Progress Solar parts with him to Texas because "those don't belong to you [Schmidt]". *Id.* at 126:1. However, during the second day of his deposition, after he was confronted with the additional facts and exhibits discussed below, Long effectively acknowledged that, in reality, he continued working with Schmidt on fabricating and marketing the Power Cube until at least early 2016. *See, e.g.,* Long Dep. 478:10 to 479:10 (Long admits that Ex. 167, a Jan. 5, 2016 email thread between him and Schmidt, is the earliest written acknowledgement of Long's "breaking up" with Schmidt), 498:20 to 499:20 (acknowledging that Ex. 169, Long's texts with Schmidt, establish their relationship continued after Schmidt returned home from Texas in late 2015), 516:9-25 (Long concedes it appears Schmidt, Carter Bosquet and him were still working together on the "power cube" design at the end of 2015); Dep. Ex. 169 at, *e.g.,* p. 1 (in Schmidt's "Outgoing, 12/1/15 8:53:35 AM" text as he was leaving Long's place in Texas, Schmidt refers to how "working together" is going to be a "fun ride"), p. 6 (in the "Incoming, 12/30/15 4:15:00 PM" text, sent while Long was in NC overseeing another Progress Solar shipment, and after Schmidt and him hadn't been able to set up a dinner with Carter Bosquet, Long states: "Monday, we should all start planning again").

29. A trade show took place in Austin Texas on December 1 and 2, 2015[10] that Long attended, as apparently did "Chief Parsons" and "Chief Parson's boss"; the news of the latter's involvement caused Long's deodorant to "go away" or evaporate. *E.g.,* Dep. Ex. 169 at p. 2,

---

[10] Schmidt left Long's home in Texas in the early morning of December 1, 2015 to return to NC. *See* Dep. Ex. 169 at p. 1 (Schmidt's "Outgoing, 12/1/15 8:53:35 AM" text thanking Long for his hospitality). Clearly, Schmidt and Long were trying to get their Power Cube design and basic attributes ready for this Austin, Texas trade show.

13

("Incoming, 12/2/15 9:05:29 AM" text from Long), App. p. 274. On the morning of December 2, Long was unable to find the spec sheet and other proprietary information Schmidt had sent him previously, and Schmidt's wife, Whitney, had to email that information to Long because Schmidt hadn't brought his laptop. *Id.* at p. 2 (see texts from "Incoming, 12/2/15 9:00:25 AM" to "Incoming, 12/2/15 9:22:58 AM"), App. p. 274; *see also* Long Dep. at 503:4–24, 505:1-9.

30.    Armed with Schmidt's pricing information, Long texted Schmidt later that day that he had "sold two units" at the trade show, including a prototype that was to be sent to "a real base at the very front line." Dep. Ex. 169 at p. 3, App. p. 275 (see texts from "Incoming, 12/2/15 12:30:47 PM" to "Incoming, 12/2/15 12:37:58 PM"); *see also* Long Dep. at 440:20 to 441:2 (Long confirms he was "attempting to make sales of the [SGPC] 2400s" at the December 2015 military trade show in Austin), *id.* at 505:1-23 (Long also confirmed to Schmidt that the sales were of "light cubes" they had developed, not Progress Solar's "SLTs"). Long's schmoozing of military officials continued through dinner on December 2, 2015. Dep. Ex. 169 at p. 3, App. p. 275 (*e.g.*, "Incoming, 12/2/15 10:29:51 PM" text). Long's efforts to sell the "Power Cube" he planned to manufacture at that military trade show were aided by FPI, whose Vice-President, Defendant Bills, also attended that event and the dinner. Long Dep. at 506:12 to 507:21. Progress Solar was entirely unaware of Defendants competitive efforts at the trade show, so much so that before the show began, Progress Solar authorized Long to take a Progress Solar light tower to Texas for demonstration purposes. 2021 Robertson Dec., ¶6, 18-19, App. pp. 445, 448.

31.    On December 3, 2015, Long texted Schmidt that he was getting "steel prices today" to "get started". Dep. Ex. 169 at p. 4 ("Incoming, 12/3/15 1:02:09 PM" text), App. p. 276. Long also told Schmidt he would bring him a thumb drive with the drawings on it since he "did not think

to get Allen [Daragalyi of SAG] to make you thumb drives." *Id.* at p. 4 ("Incoming, 12/3/15 1:03:36 PM" text to "Incoming, 12/3/15 1:04:10 PM" text), App. p. 276.

32.     Long was at Progress Solar's Wake County, NC facility to oversee the shipment of more light towers from December 9 to 11, 2015; he had dinner with Schmidt at Applebee's on Wednesday, December 10. *Id.* at p. 5, App. p. 277. Just before the New Year, 2016, Long returned to Wake County to monitor another shipment of SLTs for FPI; Schmidt and he tried to set up another dinner then, together with Carter Bosquet, but did not manage to do so. *Id.* at pp. 5-6, App. p. 276–77.

33.     On January 4, 2016, Schmidt followed up by email with Long and Bosquet, asking when they wanted to meet. Dep. Ex. 167 at p. 2, App. p. 256. In response, Long—who, by that point, knew there was a U.S. military market for the Power Cube light towers—emailed Schmidt back the next day, writing:

> I was wanting to do this in person but I guess I'll send an email.
> I'll be bringing all your stuff back around the 18th. I haven't been comfortable since our Dallas meeting and just don't feel right about this at this time.
> **Bob, I feel you should maintain control of your dream these are your ideas and you know best how to get them to market**.

*Id.* at pp. 1-2. App. pp. 255-56 (emphasis added).

34.     Schmidt quickly responded, explaining he thought they had corrected their misunderstanding about their respective ownership and profit-sharing interests before Schmidt left Texas the previous month. Schmidt added that he didn't want to "do this by myself and succeed in three or four years," instead, he "want[ed] to do it with you [Long] and we both succeed in one [year]." *Id.* at p. 1, App. pp. 255.[11]

---

[11] This last paragraph of Schmidt's indicates he believed Long when Long told him to "maintain control of your dream."

**After telling Schmidt he was no longer interested in the Power Cube, Long continued to actively market his own product based on Schmidt's design, and formed SMS for that purpose, while continuing to regularly visit Progress Solar's facility and allegedly trying to sell Progress Solar's SLTs.**

35.     In November 2015—the same month that Long entered into both the NDA with Progress Solar (*e.g.*, D.E. 89-1) and the JCA with Schmidt (D.E. 1-1; also Dep. Ex. 163)—Long began working on the formation of his own company, Solar Mod Systems, Inc. ("SMS"). *See* Long Dep. at 552:15–24.

36.     On January 13, 2016, just days after telling Schmidt that Schmidt "should maintain control of [Schmidt's] dream" (Ex. 167 at 2), Long caused Judgment Debtor Solar Mod Systems, Inc. ("SMS") to be incorporated in Texas. Dep. Ex. 80; *accord* Long April 7, 2017 Dec., ¶11, D.E. 10-1 at p. 2. Long has repeatedly represented that he is the sole shareholder and decision maker for SMS. *Id.* ¶11-12. FPI immediately understood and recognized that: "Mike Long and SMS are the same[.]" JVV/FPI Dep. at 80:8–11.

37.     Meanwhile, Schmidt remained in the dark as to whether Long and he were still working on the "Power Cube" business venture together. Thus, on January 20, 2016, Schmidt texted Long, asking: "Are you still onboard? I still don't know where we are. You haven't responded to my emails. Are you in?" Dep. Ex. 169 at p. 6 ("Outgoing, 01/20/16 12:28:35 PM" text).

38.     Long responded that he was "not doing the Lightstand thing" because "it [sic] not worth the hassle [and] I'll bring your stuff back on next trip . . . . Everyone is concerned about what they will make and I already make enough with no hassle." *Id.* ("Incoming, 01/25/16 8:00:55 PM" text).

39.     Long never disclosed to Schmidt that SAG already had begun production of a prototype Power Cube, or SGPC-2400, much less that he subsequently secured millions of dollars

16

of sales of the Power Cube portable light tower that was based on Schmidt's and Progress Solar's proprietary information. 2021 Schmidt Dec., ¶¶12-13, App. pp. 464-65.

40.     On March 3, 2016, FPI, through Steve Van Valkenburgh, and SMS, through Michael Long, entered into a Memorandum of Understanding or "MOU" regarding SMS' forthcoming manufacture of its power cubes, which SMS subsequently referred to as Solar Gen or Generator Power Cube or "SGPC". *See* Dep. Ex. 6 contained at pp. 38-39 of 148 in the previous Appendix filed Dec. 2, 2019 at D.E. 134 (the "2019 Appendix");[12] Long Dep. 553:6-25 (Long isn't sure about where the acronym SGPC came from but suspects SVV or Bills coined it). This MOU stated, among other things, that it had been established "to capitalize on the experience of both N. Stephen Van Valkenburg and Michael Long to develop, manufacture, and sell solar light products," and that "FPI and SMS will equally share in ownership and cost of production of all products developed by SMS," and will "equally split the profits on all sales." Dep. Ex. 6 at 1, D.E. 134 at p. 38. The agreement also specified that it set forth "the terms and understanding between" FPI and SMS "to develop, manufacture, market, sell, and distribute solar light towers", further confirming that SMS SGPCs and PSS SLTs are competing products. *Id.*

41.     In March 2016, SAG, FPI, and SMS held several demonstrations for the military in Texas of a SGPC prototype. *See* Dep. Ex. 158 (Jim Vincent Declaration in Texas litigation with exhibits) at ¶¶16-17, p. 5 of 169; *see also* Bills Dep. at 183:2–15 (Bills made multiple trips to Texas while "employed by FPI" regarding the development or manufacture of the SGPC).

42.     In or about April 2016, Long and FPI, through SVV, arranged to have a prototype of the SGPC-2400 sent to Camp Arifjan, Kuwait for further demonstration and marketing

---

[12] Hereafter, references to the 2019 Appendix will be to the Appendix' docket entry number (134) at the relevant page number together with, where applicable, the previously filed Deposition Exhibit ("Dep. Ex.") number and the pertinent page(s) of the 2019 Appendix.

purposes. Long Dep., 378:13 to 379:5. The prototype's arrival was timed to coincide with a visit to Camp Arifjan by Arnold Schwarzengger as well as a push by the military to use renewable energy where feasible. *Id.* at 379:6-20, 386:1-16.

43. Although Long denied that the SGPC prototype was shipped to a U.S. military base in Kuwait without authorization, he conceded that it was SVV, not himself, who allegedly dealt with obtaining authorization, and that Long does not know if formal authorization was ever obtained. *Id.* at 377:20 to 380:9. Long also acknowledged that no one ever paid for that prototype, although an invoice was issued to Chief Warrant Officer 3, Cipriano Trujillo, for it. *Id.* at 379:14-15, 380:10-12, 384:18 to 385:10; *see also* Dep. Ex. 159 (said invoice dated 4/26/16 for $48,650), App. p. 242.

44. Neither Long nor anyone affiliated with FPI gave any notice or indication to Progress Solar of SMS's formation, much less that its purpose was to manufacture and sell "solar light products," and thus compete with Progress Solar. *See* FPI Answer to the Second Amended Complaint at ¶53, D.E. 91 at p. 10 ("FPI admits that it never had cause to inform plaintiff as to the existence of SMS or of any products it was offering."); *cf.* 2017 Robertson Dec., ¶¶73-76, 86, D.E. 28 at pp. 19-20, 23.

45. As a consequence of Plaintiffs' being kept in the dark about the formation of SMS and Defendants directly but surreptitiously competing against Progress Solar, Dan Robertson, SVV, and Long continued to correspond and communicate regularly regarding Long and FPI's purported attempts to sell Progress Solar light towers in the Middle East. *E.g.,* Long Dep. at 223:15–23.

46. Long spent much of April and at least May, 2016 in Kuwait and on other military bases in the Middle East. *E.g.,* Long Dep. at 386:17 to 387:18. During that time, Long both

continued with his efforts to market and sell the SGPC-2400 (unbeknownst to Progress Solar), while also training the military personnel and that of its contractors in how to set up, aim, and otherwise use Progress Solar's SLT-1000s. At least one military official subsequently informed Daniel Robertson that Long had incorrectly trained attendees to point solar panels West rather than South thus decreasing the solar panels' amount of solar absorption and making Progress Solar's SLTs seem like an inferior product. *See* 2021 Robertson Dec., ¶22, App. p. 449.

47. In late April, 2016, SVV joined Long in the Middle East for a number of weeks, purportedly to focus on marketing Progress Solar's light towers to various military officials while also attending some of Long's training sessions. *E.g.*, Long Dep. 82:1 to 85:24 (discussing, *e.g.*: training sessions at Camps Arifjan, Buehring, Redleg, Sword; how Long did everything—training, repairing and marketing—during his Mid-East trips; how SVV sent Robertson photos from one training session; and how SVV came home in May, while it was likely June 2016 before Long returned).

48. During SVV's and Long's 2016 trip to the Middle East, they exchanged regular correspondence with Dan Robertson regarding their purportedly successful sales efforts, while saying nothing about their parallel efforts to compete against Progress Solar by selling SMS' SGPCs. *See, e.g.*, Dep. Exs. 136, App. p. 72 (April 27 status inquiry by Robertson); 135, App. p. 71 (May 24, 2016 Robertson email to SVV and Long regarding upcoming price increases in metal and ability to beat the same if Chief Prosper expedites his anticipated order of more than 600 PSS SLTs); and 63, App. p. 55 (June 1 email from SVV to Robertson letting him "know we had a very successful trip" with "a lot of training and smoozing," and that Long stayed "2 extra weeks at the Army's request as there were more teams at outer rim bases that needed help on positioning and training with the timers").

49.     Meanwhile, Defendant Bills was busy exchanging correspondence with various prospective military buyers about both Progress Solar's SLTs—*e.g.*, Dep. Ex. 174 & 175 (April 2016 email exchanges and informal request for quotes between the Navy's Daniel Wiseman and Bills)—and SMS' SGPCs. *See* Dep. Ex. 176, App. p. 288. None of these emails, or their request for quotes as to Progress Solar units, were shared with Progress Solar. 2021 Robertson Dec. at ¶20-21, App. pp. 448-49. Furthermore, careful review of that correspondence also shows how Bills was tipping the scales in SMS' favor. *See, e.g.*, Dep. Ex. 174 at pp. 2-3, App. pp. 283-84 (Bills, who embedded his answers within Wiseman's initial April 29 email, discusses SMS giving a four year warranty versus Progress Solar's two year warranty, and notes that Progress Solar's units don't come with a compass while the SGPC's do since Bills, unlike Progress Solar, was aware of this recent request); that April 29, 2016 email thread produced by Bills bearing bates-stamp B 953, App. p. 315 (when Dan Wiseman of the Navy expressed interest to FPI about purchasing Progress Solar's SLT 1200, rather than the lower-priced SLT 1000 model, Bills responded that although the operational difference between the two models was minimal, the cost differential was significant). Neither of those emails was shared with Progress Solar. 2021 Robertson Declaration at ¶21, App. p. 449.

### The relationship between Progress Solar and FPI sours, and Progress Solar proposes a new Dealer Agreement.

50.     On March 21, 2016, SVV provided Dan Robertson with a proposed MOU between FPI and Progress Solar which, among other things, sought: i) exclusivity for FPI on all sales to or through a MRO prime vendor, and ii) a reduction in the price Progress Solar received from sales of the light towers to the military, but no corresponding reduction in FPI's commission, even though FPI was not supporting Progress Solar's effort to sell more of its light towers to the military in the fashion Progress Solar expected. *See* Dep. Ex. 102, D.E. 134 at pp. 93-94; *see also* Dep.

Ex. 173, D.E. 134 at p. 109 (where Steve Van Valkenburgh forwarded to Long SVV's underlying correspondence with Dan Robertson).

51.    Progress Solar's Corporate Manager, Dan Robertson, responded that same day in an email to SVV in which he wrote that the MOU was "in no way acceptable and I'm steamed that you even proposed it." *Id.* In that same correspondence, Progress Solar informed FPI that the original Dealer Agreement from 2012 had expired and that it would be sending FPI a new proposed Dealer Agreement. *Id.*

52.    On, among other occasions, April 12, 2016, Dan Robertson sent SVV and Bills an email to which he attached a proposed new Dealer Agreement to replace the original agreement from 2012. Dep. Ex. 100, D.E. 134 at pp. 72-92.

53.    FPI never executed the new Dealer Agreement. 2017 Robertson Dec., ¶87, D.E. 28 at p. 23. Discussions related to a replacement Dealer Agreement continued into the summer of 2016. It was not until July 14, 2016 that SVV explicitly notified Progress Solar that FPI's counsel "has advised us not to sign the Dealer Agreement you sent us." Dep. Ex. 178 at SMS-Long_001747_002, D.E. 134 at p. 110.

54.    Accordingly, "the relationship between FPI and Progress Solar had definitively ended" by "July of 2016." Bills Dep. at 129:21–130:7.

### Progress Solar learns the Defendants have conspired against it to set up a competing business, and obtain orders therefor.

55.    On Tuesday, June 14, 2016, a representative of Noble Supply, one of the MROs, sent a request for quotation or "RFQ" that the DLA had issued in which it sought bids for both Progress Solar and SMS light towers (aka, for SMS, the SGPC-2400). *See* Ex. G to FPI's Counterclaim, D.E. 12-7; *see also* Dep. Ex. 58, D.E. 134 at p. 37.

56. Dan Robertson saw a copy of this RFQ on that same date. 2017 Robertson Dec., ¶73, D.E. 28 at pp. 19-20.

57. Up until he saw that RFQ on June 14, 2016, neither Dan Robertson nor any other Progress Solar employee was aware of the existence of SMS or that there was another manufacturer of portable solar light towers to whom the DLA might issue a targeted RFQ. *Id.* at ¶¶74-75. *See also* FPI Answer to the Complaint at ¶46, D.E. 12 at p. 8 ("FPI admits that it never had cause to inform plaintiff as to the existence of SMS or of any products it was offering.").

58. Dan Robertson then searched the internet for more information about SMS and discovered that the address listed for that company was the same as Long's address. 2017 Robertson Dec., ¶75, D.E. 28 at p 20.

59. Progress Solar's Dan Robertson next contacted the FPI representatives and Long. During a conference call, Steve Van Valkenburgh and Long eventually confirmed that Long owned SMS, and that FPI was acting as a sales representative for SMS. *Id.* ¶76.

60. That evening, Dan Robertson received an email from Long in which Long claimed that SMS's light towers were "a vision that came up while I was on the ground, with the guys during our visits [sic] never really imagined they would actually place an order, but you know how life goes." *Id.* ¶77; *see also* 2017 Robertson Dec., Ex. 19, D.E. 28-20 at p. 2 of 3. In response, Dan Robertson asked Long to provide the specifications on the SMS light towers. *Id.*

61. Over the following weeks, Progress Solar and Dan Robertson unsuccessfully continued to seek information about the SMS light towers from Defendants. 2017 Robertson Dec., ¶¶78, 84, D.E. 28 at pp. 21-22.

62. In the meantime, Long and Stephen Valkenburgh continued to strategize about how to disadvantage Progress Solar to SMS' benefit. *E.g.*, Dep. Ex 177, App. p. 290 (June 21, 2016

Long email to SVV recommending: 1) FPI send in quotes for SMS' unit with submitting quotes for Progress Solar's and opining that Progress Solar couldn't submit competing quotes "because if that were allowed every Solar Light company in America would be allowed to bid," and that while "Dan" may want to renegotiate, he is not likely to "walk away from a 7 mm order")

**Schmidt and APW file and obtain a pending patent for Schmidt's
"Modular Photovoltaic Light & Power Cube" and assign all rights therein
over to Daniel Robertson and Progress Solar who continued development
and patent work until it was finalized.**

63. On November 11, 2016, Schmidt filed a patent application for his "Modular Photovoltaic Light & Power Cube." 2021 Schmidt Dec., ¶8 & Ex. B, App. pp. 463-64, 507-532.

64. The USPTO issued a patent covering Schmidt's "Modular Photovoltaic Light & Power Cube" on March 19, 2019 (the "Power Cube Patent"). The Power Cube Patent claims the benefit of priority to U.S. Provisional Patent Application No. 62/254,997, filed November 13, 2015. *Id.* ¶7-8, 14, & Ex. B thereto, App. pp. 463-65, 469-505; 2021 Robertson Dec. ¶15.

65. On May 7, 2018, Schmidt and APW transferred to Robertson the rights to the Power Cube Patent (and the underlying application), as well as all intellectual property and all related trade secrets, confidential information, and causes of action related to the Power Cube Patent. Schmidt Dec., ¶4, App. p. 463; 2021 Robertson Dec. ¶¶12-13, App. p. 446-47. After the assignment in 2018, Robertson worked with the patent counsel Schmidt and APW had initially retained to successfully complete the prosecution of that patent, resulting in the patent's issuance in 2019 as referenced in the preceding paragraph. 2021 Robertson Dec. ¶14, App. p.447.

66. On June 20, 2018, Schmidt—through APW—assigned to Robertson all of its rights, titles, and interests under the JCA. On July 31, 2018, APW and Dan Robertson amended that assignment to reconfirm and clarify that APW's assignment to Dan Robertson included all of APW's: (i) trade secrets and confidential information related to modular photovoltaic light and

power technology, solar light tower technology, and the Modular Photovoltaic Light and Power Cube; (ii) claims relating to those trade secrets and confidential information; and (iii) claims against Mike Long, SMS, ERS, Inc., and FPI. Schmidt Dec., ¶4, App. p. 463; 2021 Robertson Dec. ¶¶12-13, App. pp. 446-47.

### Long and Bills file for a patent to cover the SMS Power Cube, but are rejected in light of Schmidt's Power Cube Patent.

67. On March 31, 2017, Long and Bills filed an application to cover the SMS Power Cube. Patent Filing available via USPTO website, Application Number 15/941906. That application included a light "mast" that "sticks up from the box." Long Dep. at 168:2–7.

68. On May 3, 2019, Long and Bills' application was rejected by the USPTO. More specifically, the grounds for rejection of nearly every claim contained in Long and Bill's application was because the claims were "anticipated by Schmidt" in the patent application covering Schmidt's Power Cube Patent. *See* 2021 Robertson Dec., ¶17 & Ex. 1, App. pp. 447, 452-61.

### Long, Bills, and FPI take action to destroy Progress Solar's reputation with the military, and use Progress Solar's trade name and intellectual property to suggest false associations.

69. Once it was clear that Progress Solar and the Defendants had permanently parted ways, Long, Bills and FPI doubled down on using their relationship with various military officials—whose previous experience with Defendants was in their capacity as representatives for Progress Solar—to undermine Progress Solar's reputation within the military and to otherwise unlawfully compete with Progress Solar. For example:

    a. FPI emailed the highest ranking officials at Noble Supply after the FPI and Progress Solar Dealership Agreement had conclusively terminated, and

indicated both that (i) FPI had created Progress Solar's light towers and (ii) that

the new SMS product was superior to Progress Solar's light towers:

> While we [FPI] have worked in collaboration with the military and supply companies previously, our experience with Noble has been the pinnacle of our achievements. From your first orders of **our FPI** SLT-1000(f) Portable Solar Light Tower to working with the U.S. Army and Solar Mod Systems (SMS) to design our new Solar Gen Power Cube (SGPC-2400-12), and presenting our products and achievements to Noble, FPI has reached a new level of accomplishment.
>
> ****
>
> Sincerely,
>
> Steve Van Valkenburgh and the entire FPI and SMS teams

Dep. Ex. 180; App. p. 308. Progress Solar was never informed of these communications. *See* 2021 Robertson Dec., ¶21, App. p. 449.

b. Without informing Progress Solar, Bills directly responded to military personnel's requests for technological changes to future orders of Progress Solar and Solar/Wind light towers (also referred to as "SLTs", SLTW's and "light carts") by asserting that the SLTs were outdated and had been replaced by a "better system", that being the SGPCs which were available for sale through FPI. Dep. Ex, 183, App. p. 312.

c. When Pham Phong, who succeeded Daniel Wiseman as one of the military officials involved in the ordering process, asked Bills with a cc to Long for a "price update" on both the FPI SLTW1000 and the SGPC-2400, Bills never responded to that inquiry, not even to inform Lieutenant Commander (LCDR) Phong that Progress Solar made the SLTW1000 and was no longer represented

25

by FPI. Dep. Ex. 182; App. p. 309; *see also* Long Dep. at 588:3 to 589:2 (confirming he never forwarded or made anyone with Progress Solar aware of this inquiry nor did he discuss with Bills whether FPI should do so).

d. Similarly, and again without informing Progress Solar, when Bills received multiple military personnel requests for repairs to shipping damage to Progress Solar units, he attempted to sell SMS products instead, by "touting the virtues and benefits of SMS's product over those of Progress Solar's products." Bills Dep. at 219:6–220:24; *see also, e.g.,* Dep. Ex. 101; App. pp. 63-66. Although the initial military requests were sent to Bills' FPI email address—Dep. Ex. 101 at p. 3, App. p. 65 (December 25 email from Navy Petty Officer First Class Vandewalker at bottom and then Bills' initial response dated December 26)—Bills sent his detailed December 28, 2016 reply that both disparaged Progress Solar's SLTW1000s and exalted the SGPC-2400 and 1600s from his SMS email address. *Id.* at pp. 1-2, App. pp. 63-64; *see also* Robertson Dep., at 405:16 to 406:1. Moreover, while the initial emails make clear that the military official handling this shipping damage issue, Vandewalker, was unaware of the difference between Progress Solar and SMS or their products, and thus made this damage report to the wrong people (Bills, Long and FPI rather than Progress Solar), Bills made no effort whatsoever to explain this. Instead, Bills unabashedly took advantage of the confusion to benefit SMS and himself.

70. Long, SMS, FPI, and Bills converted the proprietary information they had regarding Progress Solar's ability, due to its proven track record (history), to obtain significant deposits from Noble, an MRO prime vendor to the DLA, and the percentage amount of that deposit

26

or advance payment, and used that in selling SMS' products.[13] *See* Bills Dep., at 253:4–20; Long Dep. at 598:15-24; Dep. Ex. 185, D.E. 134 at p. 118 (in a Boxing Day, 2016 email to SVV, Long complains about how FPI has given Noble too many discounts without informing him first and then notes in the third-from-the-last paragraph the specific down payment percentage Noble paid to Progress Solar previously).

71.     As already evidenced by the documents referenced in the foregoing subparagraphs, Defendants used FPI's relationship with Progress Solar to create false associations between FPI and Progress Solar so it appeared that Progress Solar's products were actually FPI's. Among other things:

a.  Without Progress Solar's knowledge, FPI sent quotes to the military for Progress Solar's light towers with documentation effectively claiming that the light towers were FPI's, rather than Progress Solar's, including by referencing Progress Solar's patent and interposing "FPI" prior to the Progress Solar model numbers. *E.g.*, Ex. F to FPI Ctr'claim in the 2017 Case, D.E. 12-6

b.  FPI emailed Noble Supply in August, 2016, after the FPI and Progress Solar Dealership Agreement had terminated, and claimed both that (i) FPI had created Progress Solar's light towers and (ii) that the new SMS product was superior to Progress Solar's light towers. *See* Dep. Ex. 180, App. p. 308.

c.  FPI admitted that it placed images of Progress Solar's solar light towers on the FPI website, including a direct reference to PSS' patent for its SLTs, without

---

[13] As illustrated by how Bills, *et. al.* handled other issues such as the Military's confusion about who to approach regarding shipping damage to the SLTs Progress Solar sold the DLA in 2016 following the cessation of its relationship with FPI, the Defendants kept the DLA and the relevant Military personnel in the dark about the fact that Progress Solar and SMS were different, and unrelated, solar light tower manufacturers.

any attribution or reference to Progress Solar. FPI Dep. at 116:20–117:9; *see also* Dep. Ex. 90, previously filed at D.E. 28-22. FPI continued to maintain those images and information on the FPI website without attribution to Progress Solar even after FPI received notice from Progress Solar that those uses were unauthorized. *E.g.*, Aug. 31, 2016 G. Parsons' Cease and Desist Letter to SVV and Bills, produced by Defendants as SMS-163.001, *et seq.*, App. pp. 316-19.

    d. In an attempt by Defendants to gain a further competitive advantage over Progress Solar, FPI's representatives emailed and obtained from Noble Supply Progress Solar's purchase orders and shipping schedules for at least the 79 SLTs that Noble Supply had recently ordered from Progress Solar, trading on Noble Supply's belief that FPI was still Progress Solar's dealer, and. *See* email thread from Fall 2016, stamped Noble 0262 to 265; App. at pp. 320-23.

72. FPI and Bills made repeated use of Progress Solar's products and patent, without attribution to Progress Solar, even though the Dealer Agreement specifically prohibited that particular type of misconduct. Section 14 of the Dealer Agreement provided, *inter alia*:

>     a. **** FPI shall always utilize PSS's name, trademarks, and current logos in print and electronic advertising or on the FPI website when representing PSS products. Any misrepresentation utilizing other names, branding or logos is grounds for immediate termination as an authorized dealer, "no exceptions."

D.E. 28-6 at p. 6 of 9.

### Progress Solar lost sales due to Long, Bills, SMS, and FPI's actions.

73. Progress Solar lost verifiable sales due to Long, Bills, and FPI's actions. More specifically, the DLA ultimately ordered a total of **438** of SMS' SGPC-2400 through Noble Supply (the same MRO who ordered 250 SLTs from Progress Solar the year before). *See, e.g.*, Dep. Exs. 69 & 69-A (Purchase Orders and, in Ex. 69-A, changes thereto), D.E. 134 at 59-65; *see also* Dep.

28

Ex. 70 (Order Agreements), D.E. 134 at 66-67; Dep. Ex. 71 (Award Notice of 11/2/2016 for 263 units), App. p. 58-59.[14]  The Purchase Orders were placed on August 11 (first three POs totaling 175 units) and November 22, 2016 (last two POs totaling 263 units).

74.     The Purchase Orders, including the changes to the two November 22 invoices, resulted in Noble Supply depositing $2,106,000 with FPI for the units and then, after the units were shipped, paying a remaining total of $11,124,750. Thus, the total amount paid by Noble Supply was $14,859,150.[15]

75.     Each Purchase Order ("PO") set forth the anticipated shipping schedule for the units being purchased in that PO.  According to the POs, the final shipment was anticipated to occur on January 21, 2018.  *See* D.E. 134 at p. 64.

76.     Except for the wiring of certain light fixtures and attachments, the vast majority of the fabrication of all the SGPCs that Noble purchased for the DLA were actually manufactured by Commercial Body & Rigging or Halo Fabrication, both of which involved Long's friend, Bobby Horton.  Long Dep. at 135:5-19, 138:4-25, 396:15-19.  Long did not advise anyone associated with the Military or the DLA that CB&R or Halo Fabrication actually manufactured the SGPCs.

77.     Given the similarities between the various types of solar light towers (SLT), solar/wind light towers (SLTW) and solar/hybrid light towers (SHyb) that Progress Solar had available prior to 2016 and 2017—including a hybrid solar light tower that included at the buyer's

---

[14] The Purchase Orders, Exs. 69 and 69-A, accurately reflect that the total number of SPGCs purchased by the DLA through Noble Supply was four hundred thirty-eight (438). Defendant Long confirmed in his deposition that the total number of SGPCs ordered by the military was 438.  Long Dep. at, *e.g.,* 157:22 to 158:7

[15] The final payment amount includes the entire $1,628,400 amount of Purchase Order 100266 for 48 units because that PO, for some reason, never included a provision for a deposit payment.  *See* D.E. 134 at p. 61 (the two November POs later were change to include deposit amounts—see Ex 69-A, D.E. 134 at pp. 64-65—but that apparently didn't occur with this final PO from August, 2016).

option a diesel, propane or gas generator as well as the ability to add an inverter, for converting DC to AC power on any model of Progress Solar SLTs—it is more likely than not that the Military and the DLA would have ordered at least 438 units of Progress Solar's light towers if not for the Defendant's acts, omissions, and misconduct as detailed above. *See* 2021 Robertson Dec. at ¶¶23-27, App. 449-51.

78.     The DLA's orders for SMS' SGPC-2400 were placed and paid for through FPI, and FPI then reimbursed SMS for those orders, less FPI's sales commission or percentage. *E.g.*, Long Dep. at 337:18 to 338:2; Bills Dep. at 47:18 to 48:16.

79.     As part of the financial scheme between Long and Bills, Bills received: i) substantial commission payments from SMS, in addition to receiving from FPI: ii) his salary, iii) further commission payments, and 4) bonus payments. Long Dep. at 338:10 to 339:13; Bills Dep. at 42:21 to 44:2 (confirming receipt of salary, commission, and bonuses from FPI); 203:19 to 205:4 (confirming receipt of commissions from SMS in addition to commissions from FPI; the total amount per unit of those Commissions was approximately $1500).[16] Upon later learning of Bill's separate commission arrangement with Long and SMS, FPI's corporate representative stated: "I hope he wasn't" receiving a separate commission from SMS but, if he was, and "he was [my] employee . . . I would have terminated him on the spot." FPI/JVV Dep. at 50:16–51:1.

---

[16] Based on this testimony from Defendant Bills, it appears he earned approximately $657,000 (438 x $1500) in commission from the 438 SGPCs that FPI sold to Noble. That sum doesn't include his salary or the bonus that FPI also paid him.

This the 26th day of February, 2021.

BROOKS, PIERCE, McLENDON,
HUMPHREY & LEONARD, L.L.P.

By: /s/ John W. Ormand III
    Gary S. Parsons
N.C. State Bar No. 7955
    John W. Ormand III
N.C. State Bar No. 14160
    Patrick Cross
N.C. State Bar No. 50646
    Post Office Box 1800
Raleigh, North Carolina 27602
Telephone: (919) 839-0300
Facsimile: (919) 839-0304
Email: gparsons@brookspierce.com
Email: jormand@brookspierce.com
Email: pcross@brookspierce.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically served the foregoing by electronic mail to

Messrs. Long and Bills and by United States First-Class Mail, postage prepaid, to the following:

Michael D. Long
3948 Legacy Street, 106-155
Plano, Texas 75023
Michaellong3@mac.com

Mikel Bills
11737 Belmont Place
Chino, California 91710
mbills@ambpowersystems.com

Jeffrey Van Valkenburgh
as Trustee for Norman Stephen Van Valkenburgh
Irrevocable Living Trust, and as last known contact
for Fire Protection Inc., d/b/a FPI Environmental
5904 A Warner Ave. #170
Huntington Beach, CA 92649

This the 26th day of February, 2021.

BROOKS, PIERCE, McLENDON,
HUMPHREY & LEONARD, L.L.P.

By: /s/ John W. Ormand III
        John W. Ormand III
N.C. State Bar No. 14160
Attorney for Plaintiff
P.O. Box 1800
Raleigh, NC 27602
Phone: (919) 839-0300
Fax: (919) 839-0304
Email: jormand@brookspierce.com

I certify the foregoing to be a true and correct
copy of the original.
Peter A. Moore, Jr., Clerk
United States District Court
Eastern District of North Carolina
By _____
              Deputy Clerk